C. B. SNYDER REALTY CO., INC., A NEW JERSEY CORPORATION, PLAINTIFF-APPELLANT, v. SEEMAN BROS., INC., A NEW YORK CORPORATION, AND FRANCIS H. LEGGETT & CO., A NEW YORK CORPORATION, BEING ANTHORIZED TO AND DOING BUSINESS IN NEW JERSEY, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued April 8, 1963—Decided April 30, 1963.

Before Judges CONFORD, GAULKIN and KILKENNY.

*Mr. Albert G. Besser* argued the cause for the appellant (*Messrs. Hannoch, Weisman, Myers, Stern & Besser,* attorneys).

*Mr. Marvin H. Gladstone* argued the cause for the respondents (*Mr. Walter H. Jones,* attorney).

The opinion of the court was delivered by

GAULKIN, J. A. D. Upon defendants' motion the trial court dismissed the first count of plaintiff's complaint, "for failure to state a claim upon which relief can be granted." We granted plaintiff leave to appeal.

The count alleged malicious interference by defendants with plaintiff's prospective economic advantage. The following is a summary of the facts asserted in the count. Since Francis H. Leggett & Co. is alleged to be a wholly-owned subsidiary of defendant Seeman Bros., Inc., and to have acted as the agent of the latter with knowledge of the facts, the defendants are collectively called Seeman.

On or about August 1, 1961 Snyder was advised by Seeman that Seeman sought approximately 25 to 30 acres of land in New Jersey, within ten miles of the George Washington

Bridge, with railroad facilities for the erection of a warehouse, and that it had made exhaustive attempts and research over an extended period to acquire property with such characteristics, but had been unsuccessful. Seeman requested Snyder to ascertain whether it could find any property possessing such characteristics available for purchase, and, if so, to submit details to it so that, if satisfactory, Seeman could negotiate for the purchase thereof through Snyder as broker. Thereupon, Snyder "ascertained that three adjacent parcels of land owned or controlled by Cobest Industrial Park, William Frederick Reckner and Rosina Francaville, comprising in excess of 30 acres, was available for purchase in whole or in part," which "possessed all of the characteristics required by Seeman, except railroad facilities." Snyder then negotiated with the railroad, and with some of the owners of lands over which a spur might be run, "and ascertained that such construction was feasible and that the railroad was probably willing to undertake the same * * * and * * * that such owners were willing to consider proposals for such construction." Snyder disclosed the foregoing to Seeman, and on or about September 1 Snyder exhibited the properties to one Landau, an officer and director of Seeman, who, upon such inspection, advised Snyder that the properties complied with Seeman's needs and desires. Landau made an appointment for the same day with Snyder for an inspection of the properties by Kratze and others, affiliated with Seeman. In spite of the appointment, the Seeman officials did not appear. Attempts by the Snyder officials to contact Seeman representatives were unsuccessful, and then the Labor Day weekend (September 2–4) intervened. On or about September 5, 1961 Snyder learned that over the weekend Seeman had purchased the Reckner property for $420,000 and the Francaville property for $630,000, in the name of Leggett, and had begun negotiations with the railroad for the construction of the railroad facilities. Title passed on October 20, 1961, Leggett agreeing to indemnify the sellers against claims of brokers for commissions.

The first count expressly alleged that:

"14. Prior to disclosing to Seeman the details of the availability of said properties for purchase, Snyder had ascertained that such properties were available for sale and that a brokerage commission would be paid if a sale was effected.

While said owners had not entered into any written agreement for the payment of commissions, Snyder alleges that except for the acts of defendants, it was reasonably probable that such commissions would have been paid by such owners to Snyder."

The count further charged that defendants "lulled Snyder into believing that Seeman was still considering the advisability of purchasing said properties, and purposely avoided all contacts and conferences with Snyder, when, as a matter of fact, Seeman had already concluded to negotiate for the properties in the name of Leggett."

All of the foregoing, alleged plaintiff, was done with the intention of depriving plaintiff of the commission which it was reasonably probable plaintiff would have earned and received from the owners.

Defendants moved for "judgment of dismissal" of this count "pursuant to provisions of R. R. 4:12–2(e)." No other reasons were given in the notice of motion. R. R. 4:12–2(e) refers to motions which assert "failure to state a claim upon which relief can be granted." After argument, the trial judge reserved decision. Thereafter, by letter to counsel, he announced that "the defendants' motion for judgment of dismissal of the First Count of the Complaint pursuant to R. R. 4:12–2, for failure to state a claim upon which relief can be granted, is granted." The judge gave no reasons for his decision, and he has filed no opinion.

Defendants now advance many arguments why the dismissal of the count should be affirmed, but we do not know precisely which of these arguments moved the trial court to its action. However, counsel seem to agree that the motion was granted upon the theory that the count was fatally deficient because it did not allege that plaintiff was in communication with the vendors of the land with reference to its prospective

sale prior to defendants' purchase of it. This is the main argument advanced by defendants on the appeal, in support of the dismissal. Indeed, it seems to be conceded by plaintiff that it had no negotiation or communication directly with the vendors prior to the purchase by defendants.

Of course, if the count were properly dismissed for any reason, even though not advanced below, the dismissal may be affirmed. We turn, then, to the defects in the count alleged in defendants' brief. They may be divided roughly into objections as to form and objections as to substance.

The objections as to form include defendants' attack upon what they claim to be plaintiff's artfulness in draftsmanship whereby plaintiff suggested rather than alleged, stated misleading conclusions rather than facts, and so forth. But even if well founded, such complaints would not justify dismissing the count but would, at most, call for amendment.

The chief attack is one of substance, and is described under point I of defendants' brief as being that "there can be no interference with a non-existent business relationship." The argument advanced under this point is that the count does not allege enough facts to bring plaintiff within the benefit of the principles stated in *Myers v. Arcadio*, 73 *N. J. Super.* 493 (*App. Div.* 1962), and the cases therein cited, because nowhere in the complaint is it alleged that plaintiff had negotiated with the owners, or had been authorized by them to seek a buyer, or had learned from them or their agents that they would pay a commission to plaintiff if plaintiff produced a buyer. Defendants say that some such factual allegation in the complaint is essential to establish a cause of action. But plaintiff could have known or learned of the fact that the owners were desirous of selling and would pay a broker a commission for obtaining a purchaser, in ways other than by negotiation or communication directly with the owners. Precisely what facts, short of such negotiation or communication, would suffice to prove with reasonable probability that the owners would have paid plaintiff a commission we should not undertake to hypothesize in a vacuum. It is

sufficient to withstand a motion such as was made here that the allegations of the complaint are broad enough to permit proof of such facts.

■ To begin with, "on such a motion as this—one which, if successful, means sudden death to the action--the court searches the complaint in depth and with liberality to ascertain whether the fundament of a cause of action may be gleaned even from an obscure statement of claim, opportunity being given to amend if necessary." *DiCristofaro v. Laurel Grove Memorial Park*, 43 *N. J. Super.* 244, 252 (*App. Div.* 1957); *Gaines v. Monroe Calculating Mach. Co., Inc.*, 78 *N. J. Super.* 168 (*App. Div.* 1963).

The basic error in defendants' approach is that it assumes that the tort here asserted is interference with an existing business relationship. It is, rather, wrongful interference with prospective economic opportunity. As was stated in *DiCristofaro, supra,* at p. 253: "[t]he existence of contract relations between the plaintiff and the third person is not a requisite to an action for interference. It suffices that there is 'unlawful interference with prospective economic advantage.'" Thus, the issues comprised by the allegations of the first count are not merely interference with an existing "business relationship" but rather whether there was "unlawful interference with prospective economic advantage" under circumstances which made it reasonably probable that, but for defendants' unlawful actions, plaintiff would have consummated the deal and been paid a commission by the owners.

Again, as was pointed out in *DiCristofaro*, at p. 254, "in this field, which Dean Green has called the 'appropriation of relational interests,' 'the possible situations are infinite and there is no formula, either simple or complex, through which the problems can all be adequately poised for judgment.' Green, 'Relational Interests,' 30 *Ill. L. Rev.* 1, 4 (1935)." See also *Sustick v. Slatina*, 48 *N. J. Super.* 134 (*App. Div.* 1957). And in *Myers v. Arcadio, Inc., supra,* at p. 500, we said that:

"in this field of the law, as in so many others, it is impossible to lay down precise rules of liability which will readily solve all cases. Each case in this field must be decided upon its own facts and that is how we shall decide this one, tempting though it is to enter upon a discussion of the general arguments (some with considerable merit) advanced by defendants."

As we said in *Sustick, supra,* 48 *N. J. Super.,* at *p.* 144:

"The essence of the cases in this field is that in adjudging whether what the defendant has done is actionable, *i. e.,* not done in the exercise of an equal or superior right, the ultimate inquiry is whether the conduct was 'both injurious and transgressive of generally accepted standards of common morality or of law.' * * * In other words, was the interference by defendant 'sanctioned by the "rules of the game."' * * * There can be no tighter test of liability in this area than that of the common conception of what is right and just dealing under the circumstances. Not only must defendants' motive and purpose be proper but so also must be the means. * * *."

Therefore, we cannot say at this time that plaintiff will not be able to prove facts, falling within the language of the complaint, which will entitle it to recover. It may be that after defendant obtains the factual details of plaintiff's complaint, by discovery, pretrial or otherwise, it will develop that the facts are indisputably insufficient to entitle plaintiff to recover. At that point summary judgment may be entered in favor of defendants, but not now. *Cf. Gaines v. Monroe Calculating Mach. Co., Inc., supra.*

In New York the broker apparently must prove not merely a reasonable probability that he would have been paid a commission but a reasonable certainty. Nevertheless, in *Williams & Co. v. Collins, Tuttle & Co.,* 6 *A. D.* 2*d* 302, 176 *N. Y. S.* 2*d* 99 *(App. Div.* 1958), appeal denied 6 *A. D.* 2*d* 1006, 178 *N. Y. S.* 2*d* 212 *(App. Div.* 1958), the court reversed the granting of a motion to dismiss a complaint, made on grounds similar to those alleged here. In that case it was argued that no facts were pleaded showing that the plaintiff "would have closed" with the buyer "on the same or a substantially similar contract to that ultimately made." The majority, speaking through Justice Breitel, said:

"The second question is whether, a first broker, * * * must allege in his complaint, not only the ultimate fact that he would have earned his commissions save for the tortious conduct of defendants, but must also specify in exact detail, the circumstances which would prove, on a trial, that his success was otherwise inevitable.

*      *      *      *      *      *      *      *

Turning now to the second question. the issue is whether plaintiff is bound to plead in exact detail the circumstances which, on a trial, would prove that its success would have been inevitable but for the tortious acts of defendants. The day never existed in our jurisprudence when the courts required plaintiff not only to state a cause of action but also establish in the pleading that he could prove it. With rich development in pretrial discovery it becomes even more important that issues not be resolved on pleadings alone, but rather by evidence adduced upon trial (or, at least, on motion which exposes the evidence).

True, plaintiff will have to prove the alleged tortious interference * * *. Indeed, it must show that it lost commissions and not merely a wishful dream of commissions. In this connection the proof as to the stage reached in the negotiations with the tenant will be material, and even critical. But, again, there is no arbitrary dividing line which demarks one stage of negotiations from another which, as a matter of law, must be reached before damages can be proven. * * *"

The judgment dismissing the first count is therefore reversed and the case is remanded to the trial court for further proceedings not inconsistent with this opinion.